JANVIER, Judge.
Mrs. Lonnie Mae Malone Vicknair Martinez, widow of Henry Robert Martinez, brought this suit for workmen’s compensation in her behalf as widow and for the benefit of Arthur Henry Martinez, the minor child of herself and her deceased husband. She alleges that her husband died as the result of an accident which occurred while he was carrying out the duties of his employment in the hazardous business of his employer, Dibert, Bancroft & Ross Co., Ltd., and she prays for an award of 46%% of his weekly wages for a period of 300 weeks and for penalties at 12% of the total amount because’ of the alleged arbitrary and capricious refusal to make compensation payments, and also for an attorney’s fee of $1,000 and for funeral expenses amounting to $250.
The defendants are the said employer and i-ts liability insurance carrier, American Mutual Liability Insurance Company. The Board of Administrators of The Charity Hospital of New Orleans intervened and prayed for judgment against defendants in t-he sum of $116.70, alleging that to be the cost of treatment afforded to the said employee.
Petitioner does not allege the exact time at which the “accident” occurred, but rather, by a series of allegations, charges that the excessive heat and the dust and fumes “arising incidental to the defendant’s business” caused her husband “to suffer an accident while employed.” She describes the said accident as follows: “cerebrovascular accident; spontaneous pneumonia homo thorax.”
Defendants admitted the employment of petitioner’s husband and that at the various times referred to in the petition, he was earning $1.20' per hour for a forty-hour week, and they further admitted that the defendant insurer had issued a policy of liability and compensation insurance to the employer. They denied that Martinez had died or that his previous condition had been aggravated as the result of an “accident.” They conceded that if there is liability to the plaintiff there is liability to the Administrators of the Charity Hospital in the amount prayed for.
From a judgment in favor of defendants and dismissing her suit, Mrs. Martinez has appealed.
The record leaves no doubt as to the actual occurrences which preceded the death of Martinez, and there is little or no dispute as to those occurrences. The only controversy arises over the question of whether those events can be pointed to as the cause of the death of Martinez, the plaintiff con* *691 tending that the said death was caused thereby and the defendants maintaining that the death resulted from natural causes and was in no way brought about by any unusual occurrence which can be characterized as an industrial accident.
Martinez was 29 years of age at the time of his death, which occurred in the Charity Hospital ©n July 31, 1953. He had been in the employ of the defendant employer for sometime when, on January 16, 1953, he sustained a slight injury either while operating a press of the defendant employer, or while conducting some sort of playful contest with a fellow-employee. As a result of that occurrence on January 16, 1953, he was disabled for a very short time and, on his return to work, was given lighter duties to perform. Shortly thereafter, however, he was returned to his former employment and six months after the occurrence of that first accident in January, that is, on July 27, 1953, on reporting at about 4:30 P.M. to go to work on the night shift which began at 5 P.M., he stated to his foreman that “he probably had a wild pain * * * ” and “thought maybe it could have 'been something he ate.” However, he went to work on that shift and completed the entire eight hours without again referring to any disability or discomfort of any kind.
Though the foreman left for short periods during that eight-hour shift, he was on duty at midnight at the time Martinez completed his work, and he says that Martinez at no time reported any recurrence of his feeling any pain.
On the next morning Martinez arose rather late and complained to his wife that he did not feel particularly well and they, with their young son, walked a few blocks to some place at which they ate breakfast. They then returned to the apartment. During that morning, while in the bathroom washing his face, he suffered a severe pain, though he did not report this to his wife. That afternoon he again reported for work shortly before five o’clock, but told the foreman that he was suffering considerable pain and that he was not sure that he could complete that eight-hour shift. At about nine o’clock that night he left work and, accompanied by a fellow-employee, went to the Charity Hospital. There the following diagnosis was made: “Spontaneous Pneumow Hemothorax — Possible cerebrovascular accident.” Three days later he died.
Were it not for the fact that the word “accident” appears in the diagnosis and also appears in the death certificate, there would be not one syllable in this record which could in any way, or to any extent, create the impression that there had been any unusual external traumatic occurrence which had caused the pain and ensuing death of Martinez.
There is in the record, in addition to the Charity Hospital record, the testimony of only one doctor, Dr. Sam Nadler, admittedly a specialist and an expert in internal diseases and disorders and the treatment thereof, and he testified at great length after examination of the Charity Hospital records. At the termination of the trial concerning his testimony, the Judge a quo said:
“ * * * I want to say for the record that Dr. Nadler, I think, gave a very clear exposition and I think he tried to be eminently fair in his testimony — one of the fairest witnesses I have heard for quite some time. * * * »
Dr. Nadler referred to the word “accident” as it appears in the hospital records and in the death certificate and said:
“The medical terminology ‘cerebral vascular accident’ simply means one of two or three things may have occurred: rupture of a blood vessel in the brain tissue, or thrombosis, that is plugging up of a blood vessel in the brain tissue. These two are the commonest causes of the so-called cerebro-vascular accident and has nothing to do with outside trauma. * * * ”
The testimony of Dr. Nadler, particularly this statement, simply means that where, as here without apparent cause, something internally has become involved and has given way without any external violence or un *692 usual traumatic occurrence the medical term “accident” is resorted to.'
Dr. Nadler explained the meaning of the term “spontaneous pneumow hemothorax” in a way which, remarkably enough, seems to us to be understandable to the lay mind. He says that the human lung is analogous to the bladder in a football which is surrounded by the outer covering, so that there is a space between the lung which is the bladder of the football and the outer covering which is the outside of the football. He says that this space is “potentially a closed space” and is known as the “pleural space,” and that normally there should be no air in this space. He says that if by chance air gets into this space between the outer covering and the bladder, it does not allow the lung to follow the contour of the outer covering and that then, when there is air in that space, that condition is referred to as “pneumothorax”. He says too that, if in addition to that air, blood enters, that space then it is called “pneumohemothorax”. He says that sometimes this is caused by a penetrating wound, as by a bullet or a knife, and that sometimes this condition is caused spontaneously where there is no evidence “of a traumatic injury from the outside.” That this is called spontaneous and that this condition “is not ordinarily related to the occupation” and “occurs in individuals at odd times.” that •“it occurs with dramatic suddenness and the patients invariably feel pain in the chest, a feeling of suffocation * * *.» He then said that what he has referred to as being similar to'the bladder of a football is not exactly similar because it is- not composed of one element but it is made up of innumerable small elements similar to toy balloons and if 'one of these elements similar to a toy balloon is defective and a part of it expands abnormally this is called a “bleb”, and that if one of these blebs expands to such an extent that it can no longer resist, it breaks and that this causes blood to get into that space between the lung itself and the-outer covering. That that is what occurred in this case is made' very obvious by his testimony, by the hospital reports; particularly by the fact that in one of these reports at least it is stated that a bloody fluid was removed from that particular location in the chest of Martinez.
. Dr. Nadler stated that in his opinion it was practically certain that this bleb occurred , for the first time when Martinez was in the bathroom on Tuesday morning and that it grew progressively worse so that he could not remain at work for the Tuesday night shift and that it was the ultimate cause of his death. He added:
“I do want to emphasize that the vast majority of these cases occur in persons who are not working and not coughing or doing anything.”
When asked whether he thought that the original accident six months before on January 16th had had anything to do with the ultimate occurrence and with his death, the doctor said:
“I would say it has nothing to do with this spontaneous pneumohemo-thorax.”
Dr. Nadler was asked whether he could say what might be the cause for such “blebs” as he referred to. He asked: “How old was this man?” and when told that'-“he was in his twenties * * * ” probably “twenty-nine years of age,” he answered:
“Well, he would fall well within the group born with these congenital cysts. The reason I asked his age — if 65 or 70, it is possible that other diseases may have contributed, but in the twenties or teens we look upon it as congenital. ■ I believe he was born with a defect, in the form of a.bleb or a cyst of the lung, or some such- structural abnormality.”
And he said that if an employee should suffer such a bleb while working, “I believe he would feel it then and there.”
• Our conclusion is that the record conclusively shows that there was no industrial accident which in any way, contributed to the death of Martinez or aggravated a preexisting condition.
Counsel for plaintiff, with considerable confidence, relies upon the opinion of the *693 Court of Appeal in Dortch v. Louisiana Central Lumber Co., La.App., 30 So.2d 792, the facts of which to some extent resemble those presented here, particularly in that there the plaintiff suffered “spontaneous pneumothorax” or Collapse.-of the right lung, but there, entirely differently from here, “a pain was suddenly felt from the right shoulder downward” while the employee was “pulling one end of a cross-cut saw” which “began to run heavily and pinched,” and while the employee was “using considerable effort in doing so.”
The facts of that cáse show that it was unusual exertion while working which caused the sudden pneumothorax. Here, as we have stated, there was no sudden exertion and nothing unusual which could be referred to as a traumatic accident.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.